**YOJNA, INC., Plaintiff,**

v.

**AMERICAN MEDICAL DATA SYSTEMS, INC., Defendant.**

Civ. No. 86–72334.

United States District Court, E.D. Michigan, S.D.

July 24, 1987.

Merle Jenkins, Southfield, Mich., for plaintiff.

Jeffrey Sadowski, Birmingham, Mich., for defendant.

### OPINION

COHN, District Judge.

#### I.

This case involves a dispute over the ownership of the environmental software program PROTEUS (Prototyping For The End User) and its various versions used in microcomputers. Its place in the micro-computer is shown on Exhibit 1, attached. Plaintiff, Yojna, Inc. (Yojna), initially sought a declaration that it is the owner of PROTEUS, versions 1.0 (or P–1), 2.0 or (P–2), and 3.0 (or P–3), together with enhancements and subsequent versions. Yojna also asked, *inter alia*, for a money judgment for unpaid invoices for services rendered. Defendant, American Medical Data Systems, Inc. (AMDS), sought a declaration that it owned PROTEUS and asked for certain credits against the money claim of Yojna.

The complaint was filed June 2, 1986. On February 2, 1987, AMDS's third-party complaint against Methodist Health Systems, Inc. (MHS), its former parent, was stayed pending resolution of a case now pending in Memphis, Tennessee between MHS and Integrated Medical Networks, Inc. (IMN), AMDS's new parent. On March 17, 1987, the parties agreed to sever the cross damage claims.

The case went to trial on March 23, 1987 and concluded on April 22, 1987 after eleven trial days. On April 14, 1987, based on admissions by AMDS, a partial final judgment in Yojna's favor was entered in the amount of $234,662.41, leaving $122,000 in dispute. Enforcement of the judgment has been stayed pending an appeal by AMDS, which has posted a letter of credit to secure Yojna. On April 22, 1987, based on admissions by Yojna, a preliminary injunction was entered giving AMDS access to the source codes of PROTEUS 1.0, 2.0, 3.0, and 3.3 with certain limitations on their use.

After trial, on May 11, 1987, AMDS moved that PROTEUS 4.0 (or P–4) be included in the preliminary injunction. AMDS argued that access to P–4 is essential to its competitiveness in the health care industry; that it (AMDS) partly financed the development of P–4 since it was billed for work on P–4; that P–4 was the current version at the beginning of 1986 (up to

which time it had been billed by Yojna); and that P-4 had been presented to AMDS at that time. In the Joint Pretrial Statement, Yojna had said nothing about the PROTEUS versions 3.3 and 4.0. Yojna took the fatuous position, though, that there was no such product as "P-4," but rather only an "engineering prototype" existed in early 1986; that AMDS could identify no effective document giving it (AMDS) a right to any version subsequent to P-1; that the principals of the parties never orally discussed AMDS's right to P-4; and that AMDS could not show it contributed monetarily to the development of P-4. In a draft judgment filed after trial, Yojna conceded AMDS's right to a perpetual, royalty-free license to PROTEUS 1.0, 2.0, 3.0 and 3.3 with the right to sublicense the program in the health care industry. AMDS, on the other hand, doggedly maintained in a draft judgment its exclusive right to all versions of PROTEUS.

The trial record consists of the testimony in open court and by deposition of a number of former and present employees of Yojna and AMDS as well as executives of MHS involved in the Yojna-AMDS relationship from its inception in April of 1982 to its break-up in May of 1986, plus letters, memoranda, draft agreements, agreements, studies, manuals, accounting statements and the like.

The testimony of the principal witnesses to the relationship—Shreekant Bedekar, owner and president of Yojna, and Edward O. (Neil) Douglas, principal officer of AMDS during the relationship—did not vary substantially. According to each of them, Yojna formally owns PROTEUS while AMDS has a perpetual, nonexclusive, royalty-free license to use PROTEUS 3.3 in the health care industry, plus access to the source codes to the various versions. Neither Bedekar nor Douglas was examined at trial on PROTEUS 4.0. According to their testimony, no agreement was reached regarding AMDS's rights to enhancements and subsequent versions of PROTEUS developed by Yojna. Their testimony is ambiguous as to the obligation of Yojna to stay out of the health care industry.

At the conclusion of oral argument on May 5, 1987, the Court advised the parties that it intended to find that Yojna owns PROTEUS and that AMDS has a perpetual, royalty-free license for its use up to version 3.3, including access to the source codes, and that as to the health care industry AMDS's rights are exclusive since that was the true understanding of the parties notwithstanding any writing to the contrary. Yojna disputes only the exclusivity aspect of the Court's proposed findings.

On June 11, 1987, the Court conducted a hearing on the motion to include P-4 in the preliminary injunction. The purpose of the hearing was to apprise the Court of the relationship between the parties as to P-4's development and its stage of development as of December 31, 1985. The Court ruled from the bench that AMDS is entitled to the source code of PROTEUS 3.3 plus usable improvements and enhancements existing as of December 31, 1985, whether mere discrete functions or a fully developed version of PROTEUS. The Court reopened the proofs on this issue, and the hearing was continued on June 18, 1987.

The proofs submitted at the P-4 hearing show that P-4 RUNTIME was licensed to one user as of mid-1985, althout it appears that P-4 was not released at that time since the product was not "stable." By November of 1985, P-4's major categories and related tasks had been defined and a P-4 reference manual had been written. In February of 1986, Yojna demonstrated P-4 to AMDS. By May of 1986, a complete P-4 reference manual was developed with a 1985, 1986 copyright notice.

On July 9, 1987, the Court entered a stipulated order granting AMDS access to P-4. The order entitles AMDS to a copy of the source code for P-4 GENERATE (and also P-4 RUNTIME, if in separate form) as it existed on December 31, 1985, together with the related documentation of November, 1985. The receipt of the code and documentation was conditioned on the code including the P-4 DATA DICTIONARY, P-4 DATA EDITING, and P-4 VALIDATION modules. The order goes on to

address Yojna's rights in developments subsequent to December 31, 1985; AMDS's duty to protect against dissemination of the source code; and a disclaimer of warranties.

## II.

More particularly, I find:

1. AMDS was organized in April of 1982 by MHS after discussion with Yojna to provide microcomputer capability, including application software programs, to small- and medium-size hospitals. One of the principal features of AMDS's efforts was to link the information storage capability of microcomputers in a single system without the necessity of a remote main frame computer. The application programs were intended to be turnkey and included programs to record admissions, discharges and transfers, charge postings, patient accounting, collections, bad debts, accounts payable, payroll, general ledgers and the like.

2. There was some initial uncertainty as to who would own AMDS. For a time, it was MHS's intention to include Yojna as a stockholder. By the end of January, 1983, MHS decided it would run AMDS as a wholly-owned subsidiary.

3. Yojna is a computer services company; it was employed by AMDS as a consultant to furnish programming services through contract employees who Yojna in turn contracted for in India. The programmers wrote the AMDS application programs in Memphis, Tennessee, MHS's principal place of business. Yojna separately provided Bedekar's services as a consultant to AMDS. The contract rate to AMDS for each programmer furnished by Yojna was $4,000 a month. Bedekar's rate was $7,000 a month.

4. As part of the programming effort, Bedekar and one of the contract programmers, Ranjan Prasad (Prasad), developed PROTEUS. Bedekar conceived and designed PROTEUS while Prasad refined and implemented its design and wrote the actual program. AMDS was consulted periodically by Bedekar and Prasad in the course of Prasad's work on PROTEUS. PRO-TEUS is a generic program that provides the environment in which application programs work. It has two phases: a generate phase, which is used as a prototyping tool for the design of other software systems, and a run time phase, which serves as the basis for software programs including the application software programs marketed by AMDS.

5. Between 1983 and mid–1985, PRO-TEUS went through four versions: PRO-TEUS 1.0, 2.0, 3.0 and 3.3. By the end of 1985 PROTEUS 4.0 was functionally incomplete except for at least two of the features or defined functions. Each subsequent version was derived from an earlier version. AMDS effectively paid the cost of developing the first three versions, while the cost of PROTEUS 3.3 and 4.0 was paid for partly by Yojna.

6. Simultaneously with the development of PROTEUS, a Yojna programmer named Roju Gulabani, paid for by AMDS, developed GLACE, a software program designed to allow dissimilar computer hardware to communicate or "speak" to each other. It is undisputed that Yojna owns GLACE while AMDS has a perpetual, royalty-free license to use it. Rights to GLACE are not an issue in this case.

7. PROTEUS is an integral part of the application programs marketed by AMDS. Without access to its source code, i.e., a human readable version, bugs that manifest themselves in the course of its use cannot be cleared and the program cannot be enhanced. Environmental software programs are not static.

8. PROTEUS 1.0 was available for use in the summer of 1983; PROTEUS 2.0 was available in January of 1984; and PRO-TEUS 3.0 was available in July of 1984. It is not clear when PROTEUS 3.3 and 4.0 became available except that they were available prior to December 31, 1985.

9. AMDS charged to its research and development accounts the monies it paid Yojna for programmers, including the services of Bedekar and Prasad. Yojna did not book research and development costs for PROTEUS until December of 1984.

10. The working arrangements prior to late 1985 between Yojna and AMDS were extremely informal and largely defined in terms of oral understandings between Bedekar and Douglas. Yojna and AMDS considered a number of drafts of formal agreements defining their business relationships. None of these drafts ripened into a formal agreement. The executives of MHS were aware that the relationship between Yojna and AMDS had never been formalized.

11. In November of 1983, Bedekar forwarded Douglas an outline of a proposed agreement intended to define the relationship between Yojna and AMDS based upon their discussions. As to PROTEUS, they agreed that AMDS would own it with each party having a perpetual, royalty-free license for its use with the right .to sublicense it to others at a price individually determined in the marketplace without accounting to the other. Each party was to have access to its source code. Yojna could license PROTEUS in non-health care industries while AMDS would have the right to license it in the health care industry. In the event the Yojna-AMDS overall relationship terminated, ownership, licensing and marketing rights were to continue. Bedekar and Douglas agreed in like manner as to GLACE, although Yojna was to own it.

12. Yojna kept physical control of the source code to PROTEUS. Douglas acquiesced in this arrangement since he was comfortable in the belief that AMDS would always have access to it. When a dispute arose in 1986 over outstanding Yojna invoices, Yojna withheld access from AMDS to the source code. Yojna concedes that this was improper.

13. Douglas's superiors, the executive officers of MHS, left the management of AMDS to him. They were generally aware of the existence of PROTEUS and of the shared rights to its use.

14. In July of 1984, Prasad moved to Detroit. In October of 1985, he ceased to be a contract employee of AMDS. At the same time, however, the consulting fees paid to Yojna were increased to include Prasad's services. AMDS stopped paying consulting fees to Yojna at the end of 1985.

15. Late in 1984, Bedekar and Douglas discussed the continued development of PROTEUS and Yojna's intention to use it in connection with the development of software programs outside the health care industry in a joint venture with Burroughs Corporation and others. Douglas believed that Yojna could not formally agree to an exclusive right in AMDS to the use of PROTEUS in the health care industry but had no concern that Yojna's use of it would compete with AMDS. What was of concern to Douglas was AMDS's access to the product lines of Yojna and the joint ventures to which Yojna was a party.

16. The following table describes the various elements of the Bedekar-Douglas agreements in 1983 and late 1984 as to PROTEUS:

| | | 1983 | | 1984 | |
| --- | --- | --- | --- | --- | --- |
| | Element | AMDS | YOJNA | AMDS | YOJNA |
| 1. | Nature of Interest | Title | License | License | Title |
| 2. | Use | Health care | Outside the health care industry | Health care USA | Outside the health care industry |
| 3. | Limitations | Exclusive | Exclusive | Formally Non-Exclusive | Exclusive except as to health care industry |
| 4. | Level | 1.0 | 1.0 | 3.0 | 3.0 |
| 5. | Fees & Royalties | None | None | None | None |
| 6. | Access to Source Code | Yes | Yes | Yes | Yes |

| Element | 1983 | | 1984 | |
|---|---|---|---|---|
| | AMDS | YOJNA | AMDS | YOJNA |
| 7. Right to use | Yes | Yes | Yes | Yes |
| 8. Contribution to cost of development | A significant part | A minor part | A less significant part | A greater part |

17. AMDS was not financially successful. In the summer of 1985, MHS began to explore ways to relieve itself of the financial burdens of AMDS, with sale being one possibility. Bedekar knew this.

18. In September of 1985, Bedekar on behalf of Yojna and Douglas on behalf of AMDS entered into several agreements, including separate license agreements relating to PROTEUS. The license agreements were back-dated to November 3, 1983. Under these agreements—one of which related to PROTEUS 1.0 and the second of which related to PROTEUS 1.0, 2.0 and 3.0—Yojna licensed PROTEUS to AMDS on a nonexclusive basis, cancellable under certain conditions. The agreements provided for a royalty payment by AMDS to Yojna. The terms of the license agreements were inconsistent with the oral understandings of Bedekar and Douglas and were highly unfavorable to AMDS. Bedekar and Douglas acknowledge the license agreements to be "interim agreements." Douglas had a concern at the time he signed the license agreements that AMDS needed formal assurances from Yojna with regard to PROTEUS to support the licenses it granted to various hospitals as part of its sale and licensing of AMDS application programs. Yojna never asserted any rights under the license agreements until it filed this case.

19. On September 26, 1985, Bedekar and Douglas signed an informal joint venture agreement looking to the formation of a jointly-owned company to further develop and market the products of each of them in the health care industry. AMDS was to own 40 percent and Yojna 60 percent of the new company.

20. Douglas had no authority to sign any of these agreements. Bedekar knew this. Douglas did not consult with MHS's attorney before signing the agreements. In June of 1985, Douglas's job was at risk and MHS was urgently trying to rid itself of AMDS. Douglas did not inform the executives of MHS of the existence of the agreements until he was about to leave AMDS in April of 1986. IMN was not informed of the agreements prior to its purchase of AMDS.

21. On December 31, 1985, MHS sold all of the capital stock of AMDS to IMN. This dispute arose in the spring of 1986 when Yojna began pressing AMDS for the payment of overdue invoices.

22. Yojna, while declining to grant AMDS an exclusive license for PROTEUS in the health care industry, acknowledged that it did not intend to "exploit" its use in the health care industry. Yojna acknowledges that a statement in a MHS study of AMDS conducted in the summer of 1985 is accurate:

> Yojna has been a key in the development of software development tools for AMDS and has indicated that AMDS will have the rights to these tools in the health care field while it exploits the use of these tools in other markets. This relationship must be placed in writing or difficulties will be incurred later.

23. On July 1, 1985, AMDS prepared a short-term operating plan to position itself to attract investors to alleviate its financial problems. In describing the relationship with Yojna, the plan stated:

> AMDS has access to all these products for licensing to users; Yojna has not been active in health care and does not intend to be.

24. At the end of April, 1986, there was outstanding a series of Yojna invoices to AMDS for programming services and the like totalling $248,154.90. Yojna continued to provide AMDS programming services through May of 1986 and for one day in June. Additionally, Yojna had not billed AMDS for a software program known as "Viking Emulator." In the aggregate, the

amount due Yojna according to its records is $356,662.41 represented by invoices dated March 29, 1985 through September 4, 1986.

25. AMDS seeks a set-off for $15,000 a month charged by Yojna for the services of Bedekar and Prasad for July-December, 1985 (aggregating $90,000) and an increase of $1,000 a month charged by Yojna for individual programmers for 1986 (aggregating $53,000). These amounts were billed by Yojna to AMDS on a regular basis, and AMDS did not dispute them until after the case was filed. AMDS paid the monthly consulting fee for Bedekar and Prasad for July, August, September and November of 1985.

### III.

The real dispute between the parties is over the question of who may use PROTEUS in the health care industry.

MHS entrusted Douglas with the management of AMDS and its relationship with Yojna. The 1984 oral understandings between Bedekar and Douglas are binding on AMDS. Yojna recognizes their binding effect and has made no real effort to enforce the September, 1985 written lease agreements. Copyright law, and particularly the work-for-hire doctrine, has no application to this case. Contractual provisions can supercede any potential work for hire rights. *See Whelan Assoc's v. Jaslow Dental Laboratory, Inc.*, 609 F.Supp. 1307, 1319 (E.D.Pa.1985).

What the Court must decide is limitations, if any, on the right of Yojna to use PROTEUS in the health care industry. The parties acknowledge that AMDS initially had the exclusive right to the use of PROTEUS in the health care industry. In 1984, it became important to AMDS to have access to a larger product line if it was to effectively compete for business in the health care industry. Access could best be obtained through Yojna and the joint ventures Yojna was entering into with Burroughs and others. Douglas knew that Yojna would have difficulty with its partners if it acknowledged that it did not have the right to license PROTEUS to a full range of industries. On the other hand, Douglas felt reasonably assured that neither Yojna nor its partners intended to compete with AMDS in the health care industry. Yojna knew this. While Douglas knew that AMDS did not formally have an exclusive license to PROTEUS in the health care industry, he was satisfied that this was functionally the case.

As Douglas put it:

Q. It sounds like to me that when Mr. Bedekar had the opportunity to enter into these joint ventures with Burroughs Cyberware deal and with Bull, that he realized that granting AMDS or anybody else any exclusive user rights to Proteus or Glace would interfere with that and came to you and said that I'm going to have to back off of that concept. Is that about right?

A. Yes, that's about right.

(Tr. 319.)

According to Douglas, Bedekar also said "that Yojnet [sic: Yojna] had no health care business purpose...." (Tr. 166–67.)

Douglas also said:

"It was my view that AMDS had, although there was no license agreement in place, exclusive use of these in the health care industry. (Tr. 168.)

.    .    .    .    .

"During this whole period of time, I began to understand that from a practical point of view, effectively competing with Yojnet [sic] or anybody else was probably not an issue, but contractual exclusivity probably was.

.    .    .    .    .

"Q. Is what you are saying that you believed Yojnet [sic] would agree not to compete in the health care industry?

"A. Yes, they always had, and I believe that they would have." (Tr. 171.)

There is nothing in the record to suggest that Bedekar held a contrary view.

What is missing from the Bedekar-Douglas discussions is the effect of a possible break-up in the relationship; what would occur if they went their separate ways.

Fairly, the Court concludes if Yojna and AMDS went their separate ways:

a) Yojna was to be the owner of PROTEUS 1.0, 2.0, 3.0, 3.3, and subsequent versions and enhancements.

b) AMDS was to have a perpetual, royalty-free license to use and to sublicense others to use the source codes and object codes of PROTEUS 1.0, 2.0, 3.0, 3.3, and 4.0 (as of end–1985) in the health care industry.

To fully implement AMDS's rights in PROTEUS, AMDS must have unrestricted access to the source code of PROTEUS not only to correct errors occurring in its use but also to develop new versions and enhancements. Additionally, AMDS must have the right to license others to use PROTEUS, provided such licenses are limited to the health care industry.

Whether AMDS's rights include access to Yojna's product line at a discount is problematic. AMDS has evinced no interest in such rights and therefore there is no need to adjudicate the point.

Lastly, while it is clear that the license to AMDS is nonexclusive, Yojna assured AMDS that it would not utilize PROTEUS in the health care industry and it is not unfair to hold Yojna to that limitation.

As to the amounts due Yojna, it is entitled to a partial final judgment in the amount of $122,000 for an aggregate of $356,662.41. AMDS simply has not justified its right to any reductions in Yojna's outstanding charges.

## IV.

This case in the end turned out to be far simpler than it appeared at the beginning of trial. In reality, very little divided the parties. Careful debriefing of Douglas combined with a searching pretrial deposition of Bedekar, and putting aside Bedekar's improper effort to link unpaid invoices to rights in PROTEUS, would have caused the parties to recognize that the only real issue dividing them was the exclusivity of rights to PROTEUS in the health care industry. The Court bears some responsibility for the excessiveness exhibited in this case because of its willingness to uncritically accept lawyer representations. A shadowy overlay is IMN's apparent belief, being litigated in Memphis, that it did not get all that it bargained for in the purchase of AMDS from MHS. This dispute is not before the Court. What the Court has been asked to decide are the respective rights of Yojna and AMDS in the various versions of PROTEUS. This it has done. An appropriate form of judgment shall be submitted by agreement or on notice. Following the entry of judgment, the deputy clerk shall schedule a status conference to determine what is left in this case under the orders of February 2, 1987 and March 17, 1987.*

---

* This opinion constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P.

52(a).

EXHIBIT I

Manufacturer Supplied Software
Word Processing
Spread Sheets

Proteus

Environmental
Software

Scheduling
Programs

Hardware

F

Operating
System

Input
Output

Payroll
Accounts Rec.
General Ledger

Application Software